Filed 10/1/20  P. v. Estrada CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARIO JOSE ESTRADA,<br><br>Defendant and Appellant. | B300257<br><br>Los Angeles County<br>Super. Ct. No. MA074142 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Denise McLaughlin-Bennett, Judge. Affirmed.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Nancy Lii Ladner, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Mario Jose Estrada of voluntary manslaughter and the personal use of a handgun. He appeals, and we affirm.

## BACKGROUND

An information charged Estrada with the February 2, 2017 premeditated murder of Jose Cumplido and the personal discharge of a handgun. (Pen. Code,[1] §§ 187, subd. (a), 12022.53, subd. (d).) After Estrada's first trial, the jury was deadlocked and the court declared a mistrial.

### 1. *Prosecution evidence*

At Estrada's second trial, Francisco Peralta testified he shared an apartment in Lancaster with Estrada for two years. He and Estrada each had their own bedroom. Cumplido, the victim, lived in a converted garage next to the apartment for six months. The garage and the apartment were not connected by a door. As far as Peralta knew, Estrada and Cumplido got along well.

On the evening of February 1, 2017, Peralta came home from work to find Estrada and Cumplido in the driveway, drinking beer and talking. Peralta went to bed at 7:00 p.m. because he had to work early the next morning. At 2:20 a.m., Estrada knocked on Peralta's bedroom door and woke him up. Shaking and crying, Estrada said, "I fucked up."

Peralta did not ask Estrada what happened, or look into Estrada's bedroom. He saw a little blood on Estrada's clothes, but he saw no injuries. Scared, he called Estrada's family, told Estrada's brother Ernie something had happened, and then drove to Palmdale to pick up Estrada's family.

---

[1]     All the statutory references that follow are to the Penal Code unless otherwise indicated.

2

Before Peralta left he told Estrada to call 911, but Estrada said, "No, no, fuck no." Peralta didn't know what was going on or that anyone was hurt or killed, but the way Estrada woke him up scared him.

Peralta picked up Estrada's mother Aura and his brother Ernie and drove them back to Lancaster. The round trip took twenty to thirty minutes. Ernie got out of the car to talk to Estrada. Aura stayed in the car while Peralta circled the block. He didn't want to be involved in whatever had happened.

Ernie got back into the car and Peralta drove to the sheriff's station, where Ernie talked to a deputy. The deputies followed Peralta's car back to the apartment. Smoke was everywhere. A trash can was smoking in the living room. In the kitchen, all four stove burners were burning and a kitchen towel was smoldering on the stovetop. A small propane tank kept outdoors was in the middle of the kitchen floor. Peralta turned off the burners and took the trash can outside. Peralta then drove Ernie and Aura back to the sheriff's station, where he talked to the deputies.

At trial, Peralta admitted he had testified at the preliminary hearing that he asked Estrada what happened, but Estrada didn't respond. Peralta insisted he did not know anyone had been hurt or killed.

On cross-examination, Peralta agreed that overall Cumplido was a nice guy, but when he drank he would get a little aggressive. On redirect, he agreed he had told the deputies Cumplido was "a regular guy, [a] working guy, he wasn't a bad person. He was never a bad person, man. He was a true boy. He was I want to say a fucking good guy, man. A sweetheart guy, man. He was cool with everyone." Peralta rarely saw Cumplido

when he was drinking, but had seen him be aggressive "once in a while" and didn't know why he told the deputies never. Peralta clarified he saw Cumplido act "not bad, but act different." He couldn't explain why he had not told the deputies Cumplido could be aggressive, even after he knew he had been killed.

Estrada's older brother Ernie testified he met Cumplido only once. As far as he knew, Peralta, Cumplido, and Estrada all got along. At around 4:00 a.m. on February 2, 2017, his mother Aura woke him up, saying in a panic that Peralta was on the phone and needed to talk to him about Estrada. Peralta told Ernie something had happened with Estrada, and he was coming over to pick up Ernie and Aura. Peralta arrived 10 or 15 minutes later, and on the way back to Lancaster he told Ernie that Estrada shot somebody.

When they arrived, Ernie walked in through the open front door. Estrada wasn't there. He saw blood on the carpet and on the wall in Estrada's bedroom. He went outside to look for Estrada, and saw him coming up the street with a big blue city trash can with a lid.

Ernie asked Estrada what happened, and he replied: "[H]e attacked me and I shot him." Ernie asked who, and Estrada answered, "[T]he neighbor." Ernie knew who Estrada meant. His father had told him Cumplido pulled a gun on him during a poker game about four months earlier. Ernie also had heard from Estrada, Estrada's girlfriend Jennifer Lopez, and his father and sister that Cumplido often said he had killed people in Mexico, where he belonged to a cartel, and he had come to the United States because of crimes he had committed in Mexico. When Ernie told his brother maybe he should stop

4

hanging around with Cumplido, Estrada replied Cumplido had apologized to his father, who had responded he shouldn't drink.

Ernie followed Estrada around the house, asking where the body was. Estrada said he was getting rid of it. Estrada grabbed a kitchen knife and started to cut up the bedroom carpet, taking pieces into the kitchen to burn them on the stove. Ernie told Estrada he was losing his mind, to get hold of himself, and to go to the police and tell them what happened. Estrada said, "I'm fucked," and the police wouldn't believe him. Ernie told him what he was doing looked incriminating and not like he had acted in self-defense. Ernie assumed Estrada had used the trash can to dispose of Cumplido's body. Ernie asked him why he would get rid of the body if he acted in self-defense, and Estrada said Cumplido had attacked him and he would take care of it. He told Ernie to leave.

Estrada's mother Aura got out of the car and talked to him briefly when he first returned to the apartment. She told Estrada to call the authorities if something had happened. Estrada replied he made a mistake that was his alone, and told his mother to leave. Ernie got his father on the phone, but Estrada would not talk to him.

Ernie told Estrada they were going to the police, and Peralta drove Ernie and Aura to the station. They told the person at the desk that someone had been shot. They had to wait for 30 minutes, and then they drove back with the deputies behind them. When they arrived, the trash can was spewing smoke in the living room and the stove burners all were lit. Estrada was gone.

Estrada's girlfriend Lopez called Ernie and asked if Estrada had gone to work. Ernie just told her he'd call her back,

because she was seven months pregnant and he did not want to stress the baby. Lopez often called Ernie because Estrada didn't have a cell phone.

On cross-examination, Ernie said Estrada was incoherent and unlike himself, and did not register what was said to him. Estrada did not try to stop him when Ernie said he would go to the police. When Ernie told Estrada he was incriminating himself, Estrada said someone attacked him and he shot him. When the detectives questioned him, Ernie had told them what he knew about Cumplido.

Aura testified Peralta told her he woke up because he heard an argument. When she arrived at the apartment, Estrada told her to get back into the car and he didn't want her involved.

Around 7:00 a.m., deputies found Cumplido's body in an empty lot about 700 feet from Estrada's apartment. The body lay face down near a block wall. Two narrow tire tracks, one deeper than the other, went to and from the sidewalk to the body. Nearby were a spray can, a can of lighter fluid, and a piece of carpet. Shoe prints at the apartment and around the tire tracks and the body matched the shoes Estrada wore when he was arrested.

Los Angeles Sheriff's Department Detective Omar Miranda assessed the apartment and the empty lot that morning. At the Lancaster station, he questioned Ernie, Aura, and Peralta, recording the interviews. Ernie said he thought Cumplido had killed people in Mexico.

The prosecutor played clips of the audiotapes for the jury. At the beginning of Peralta's interview (Clip 1), he told the deputies he was "knocked out" when it happened: "I was out, I didn't even hear the bullet." Estrada woke him up. He asked

what happened, and Estrada said, " 'I fucked up,' " and started to cry.  Peralta told him to call 911, but Estrada said no.  Peralta looked into Estrada's bedroom:  "I didn't see no body in there. . . . I seen his room, I didn't see nothing. . . .  The door was open but I didn't see any body or anything, you know."  (At this point in the interview, the deputies had said nothing about a shooting or a death.)

In Clip 2, Peralta described Cumplido as a regular working guy, "never a bad person," and "[a] sweetheart guy, man.  He was cool with everybody."  In Clip 3, Peralta said Estrada and Cumplido "were cool," there was "never anything bad" between them, and he never saw them argue, just "laughing and . . . having a good time."  In Clip 4, Peralta reported Estrada never said he was afraid of Cumplido, and he never saw them in conflict.

Estrada's girlfriend Jennifer Lopez testified with a grant of use immunity.  On February 2, 2017, Lopez was seventeen, seven months pregnant with Estrada's daughter, and studying to be a nursing assistant.  She sometimes stayed at the apartment with Estrada.  As far as she knew he did not own a gun.

At around 7:20 a.m. on the morning Cumplido was shot, Lopez was pumping gas on her way to class.  Estrada called and asked her to pick him up across from the Lancaster hospital.  Estrada had no cell phone or car and often used someone else's cell phone to call for a ride.  When Lopez picked Estrada up, she noticed he had scratches on his forearms and a fresh scab on the bridge of his nose.  Lopez asked why he wasn't at work and how he got his injuries.  Estrada ignored her questions and told her to drive him to the bank, where he withdrew money and gave her cash to buy a crib.  Estrada wanted to go to Ontario (where

7

he had relatives), and they ate lunch at a Burger King on the way. During the two-hour drive, they talked about the baby. Estrada didn't answer when she asked if he'd been in a fight.

Lopez pulled into the Ontario Mills parking lot and Estrada got out to smoke a cigarette. She looked back to where he had been smoking and he was gone. Estrada often disappeared without telling her where he was going. She searched for him all over Ontario until dark, and couldn't find him.

When Lopez got home her family came out the door crying, telling her the deputies were looking for her and had told her mother she would have her baby in jail. Her father called the sheriff the next day, February 3. Estrada's family picked Lopez up and the deputies interviewed her at their house. She lied and told them she had not seen Estrada. After Detective Miranda told Lopez she could get in trouble if she covered up for Estrada, she admitted she picked him up and drove him to Ontario, and he might be at his aunt's house. Estrada called Lopez and said he was turning himself in.

Lopez said Cumplido once threatened to shoot a neighbor's unleashed dog who had bitten Lopez. Lopez also saw Cumplido sharpening knives outside his door. She had warned Estrada about hanging out with Cumplido.

Sergeant Sandra Nava described the crime scene at the apartment as shown in photo exhibits. In the kitchen and eating area were a dining table and four chairs. The chairs were not booked into evidence because at the time they did not appear to have evidentiary value. Two of the chairs had red chair covers (seat cushions). A third chair cover was on top of the stove and partially burned. The fourth chair cover was crumpled on the

ground just outside the entrance.  Blood stains were on the tile kitchen floor and on the living room floor.

On cross-examination, defense counsel showed Sergeant Nava Exhibit 35, a close-up of one of the chairs without a chair cover.  She did not recall seeing anything that appeared to be blood on the two chairs whose covers had been removed.  Forensic testing did not detect blood on the unburned part of the chair cover on the stovetop, or on the cover found outside.

In Estrada's bedroom were a bed, a mattress, a dresser with a television on it, and a couch that looked like the bench seat from a vehicle propped up on two chests of drawers.  A bleach bottle and a beer bottle were on the floor.  Sergeant Nava did not smell a strong odor of bleach in the bedroom.  Pieces of the carpet had been cut out; some pieces were still on the floor. Blood was on the wall and on the cement where the carpet had been removed, and what looked like tissue also was on the carpet. A kitchen knife lay on the couch.  A bullet was embedded in the bedroom door.  An empty gun box was on the closet shelf.

In Cumplido's bedroom in the converted garage, the deputies found a methamphetamine pipe on a desk and a live bullet on a closet shelf.

Something was smoldering in a wheeled trash can on the patio between the apartment and the converted garage. There was blood in the can.

The autopsy showed Cumplido was 35 and obese, with a partially blocked artery.  He had a gunshot wound to the right temple from a gun held less than an inch away.  The bullet had exited from the left side of his head.  The medical examiner could not say whether Cumplido had been standing or sitting when he was shot.  Cumplido had some superficial abrasions on his

forehead and a light bruise on his left shin. His blood analysis showed an alcohol content of .21 percent and .34 micrograms per milliliter of methamphetamine. The cause of death was homicide by a gunshot wound to the head.

Cumplido's older brother testified he was not a violent person, except for a fistfight over a girlfriend. He did not work for the cartels and was not a killer.

**2.    *Defense evidence***

Estrada's father Ernie Estrada (hereinafter "Ernie Sr.," for clarity) testified he won $250 from Cumplido in a poker game. Cumplido had been drinking and "maybe he was a little high." He got upset and threatened Ernie Sr. that he had a gun, putting his hand behind his back. Ernie Sr. told him to take it out and use it, and Cumplido pulled out a black gun, showed it to Ernie Sr., and put it back behind him. Cumplido said he was in the United States because he was in a Mexican cartel, had killed someone, and was running away. Ernie Sr. did not call the police at the time, or tell the sheriff about the incident after Cumplido was killed.

A toxicology expert testified that long-term methamphetamine use could damage the brain. Right after ingesting the drug, a user would have a surge of energy and feel invincible, and might become violent without understanding the risks or thinking clearly. A user also could experience psychosis causing hallucinations and delusions. Cumplido's enlarged heart was a sign of chronic methamphetamine use. The amount of alcohol in his blood was twice the legal limit, which combined with his methamphetamine level, would increase an individual's propensity for aggression.

Estrada testified in his own defense. He met Cumplido a year and a half after he and Peralta moved into the apartment, and he was 24 years old when he shot Cumplido. He hung out with Cumplido and gave him furniture. Cumplido often drank alcohol. When he smoked methamphetamine, he would get fidgety, walk around, and "be talking crap about people." Cumplido told him he left Mexico because he was in a cartel and had killed some people, and other people wanted to kill him. Estrada figured that was in the past, and hung out with Cumplido because he lived next door.

Estrada was at the poker game with Ernie Sr. He left to get something from the refrigerator, and when he returned he saw the barrel of a gun behind Cumplido's back. Cumplido appeared drunk and said Ernie Sr. was cheating.

On February 1, 2017, Estrada got home from his job as an aircraft mechanic at 4:00 p.m. Cumplido was outside drinking beer and asked Estrada to join him. They hung out from about 6:00 p.m. to 11:00 p.m. When Cumplido started to smoke methamphetamine, Estrada went inside, and then invited him in to watch TV in Estrada's bedroom. Cumplido sat on the couch and Estrada sat on the couch and the foot of the bed. They were inside with the bedroom door cracked open for over two hours, and then they went outside to smoke a cigarette.

Estrada said he was calling it a night because he had to work at 5:00 a.m. the next day. Cumplido got upset and said, "[L]et's keep drinking you fucking pussy." Estrada let it go because Cumplido was drunk. He closed the front door and his bedroom door, turned off the lights, and went to bed.

Estrada woke up at 4:00 a.m. The lights were on, and Cumplido was standing at the foot of his bed pointing a gun

11

at him.  Cumplido said, "[G]et up you fucking pussy."  Cumplido had a crazy, blank look on his face and Estrada thought he was going to kill him.  Estrada stood up on the bed with his hands in the air and asked, "What the fuck are you doing?"  Cumplido told him to get off the bed, motioning with the gun and pointing it at the couch.  Estrada jumped off the bed and went for the gun. As they struggled, Cumplido punched Estrada in the nose. Cumplido kept saying:  "I'm going to fucking kill you."  Estrada managed to take the gun away, turned it around, and shot Cumplido in the head.  He believed Cumplido would kill him if he didn't shoot him first.

The gun, a .38 revolver, was Estrada's.  It had been out on the dresser when they came inside to watch TV.  Cumplido asked to see it.  He had looked at it, said it was a nice gun, and gave it back to Estrada who put it back on the dresser.

Cumplido fell back dead, with his head in a puddle of blood. Estrada went into shock, holding his head and walking in circles. He went into Peralta's room and woke him up, saying:  "I fucked up.  I shot [Cumplido]."  He didn't tell Peralta that Cumplido attacked him.  Peralta told him to call the police.  Estrada went outside to calm down, and when he came back inside Peralta had left.  It felt like a bad dream.

Thinking, "if I got rid of his body . . . it would just all go away," Estrada grabbed an outdoor trash can and brought it into the room.  He put Cumplido in the trash can, wheeled it to the vacant lot, and dumped him.  He wasn't trying to hide the body.  He moved the bed and cut out the carpet where Cumplido fell.  In the process he scratched his arms.  Estrada was not in his right mind, and thought if he removed Cumplido's blood his presence would be gone.  He burned the carpet on the stovetop,

12

using the chair covers to ignite it, and threw the pieces into the trash can. He wasn't trying to destroy evidence.

Peralta arrived with Estrada's brother and mother. Estrada was messed up and couldn't think clearly. He didn't call the police because he didn't think that would help the situation. He might have told his mother he made a mistake and was going to take care of it. He never told his family to help him hide from the police, and didn't try to stop them from going to the station. Unable to stop thinking he had shot Cumplido and believing he had to get rid of his presence, Estrada continued to burn things on the stove after his family left.

Leaving behind his work identification and his keys, Estrada ran until he got tired, ending up by the hospital where he called Lopez. She picked him up and they went to the bank, to Burger King, and then to Ontario. Estrada did not tell her what happened because she was pregnant. He left her in the parking lot because he realized he needed to get his mind right. The next morning Estrada called his father and told him he was going to turn himself in.

On cross-examination, Estrada testified he bought the gun from a friend of Peralta's about six months before he shot Cumplido. He did not register the gun, but he had fired it and knew how to use it. He kept the gun in the gun box in his closet but had taken it out the day before to clean it, and left it loaded on the dresser.

He drank about four cans of beer with Cumplido. He let Cumplido hold the gun because he wasn't aggressive at the time. They watched TV sitting on the couch and the bed; they did not bring in any chairs from the kitchen. Estrada refused to call the police because he didn't see how that would fix the problem

13

that Cumplido was dead.  Because he wasn't thinking clearly, he didn't tell Peralta Cumplido attacked him.  He acted out of fear the whole time.  He burned the chair cover only to ignite the carpet (although at the preliminary hearing he said those chairs didn't have covers), and he had no idea why he threw the other chair cover outside.  He also didn't know why he brought the trash can inside, how the propane tank got into the kitchen, or why he left all four stove burners on.  He grabbed the gun when he ran off and threw it into a trash can down the road.  He did not intentionally destroy evidence.

In closing, the prosecutor argued Estrada killed Cumplido during an argument and was guilty of second-degree murder.  The men moved two of the kitchen chairs into the bedroom to sit on while they watched TV.  They argued and woke Peralta up.  Estrada lost his temper, got his gun, put it to Cumplido's head, and shot him as he sat in the chair.  Estrada moved the chairs back into the dining area and burned the bloody chair cover on the stove to destroy evidence.  "That red stain we—police didn't grab that chair because they didn't know it was important so we have never been able to test it, but you look at that and you tell me does that look like a bunch of blood soaked through something like this and then stained that chair just like the blood soaked through the carpet and stained the cement underneath."  The wound on Estrada's nose was scabbed and too old to be from a struggle over the gun.

Defense counsel argued Estrada killed Cumplido in self-defense.  The prosecutor was suggesting that experienced police missed a blood stain on the chair, but "[t]here was not one speck of blood [o]n that chair."  Even if Cumplido had been shot sitting down his blood would not get on the chair, so the prosecutor's

14

"theory does not hold water." Instead, Cumplido woke Estrada up and in the struggle for the gun, Estrada shot Cumplido to defend himself, and then acted out of panic.

In rebuttal, the prosecutor argued that perhaps the police could have done more and "figured out the thing about the chairs," but the evidence showed Cumplido was killed while sitting in a chair. The blood got on the seat just as it got all over the place. Cumplido took two chair covers off and burned one of them, which was "real evidence" that he burned the cover because there was blood on it.

The jury convicted Estrada of voluntary manslaughter in imperfect self-defense in violation of section 192, subdivision (a), and found true that he personally used a firearm. The court sentenced Estrada to a total term of 21 years in prison (the upper term of 11 years and 10 years for the firearm enhancement).

## DISCUSSION

### 1. *Admitting the clips from Peralta's interview was not an abuse of discretion*

Estrada argues the trial court abused its discretion when it admitted into evidence the clips from the recording of Peralta's interview with the detectives.

The prosecutor told the court he intended to introduce clips from the interview. The court admitted four clips (renumbered as 1, 2, 3, and 4) over defense objection.

#### a. *Clip 1*

In Clip 1, Peralta said he was "knocked out" and "didn't even hear the bullet," he looked into Estrada's bedroom and "didn't see any body or anything," and from the doorway to his bedroom he could see through Estrada's open bedroom door. The prosecution argued this hearsay evidence was admissible

15

because Peralta's statements were inconsistent with his trial testimony.

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." (Evid. Code, § 1235.) Relevant evidence includes "evidence relevant to the credibility of a witness . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "There is no requirement that impeachment evidence directly contradict a witness's testimony to be admissible; it need only *tend* to prove that the witness is not credible." (*People v. Turner* (2017) 13 Cal.App.5th 397, 409.) Estrada argues Peralta's interview statements were not inconsistent. We disagree.

Peralta testified he did not look into Estrada's bedroom, and did not know anyone had been hurt or killed until after he talked to the detectives. Yet at the beginning of his interview he told the detectives he did not hear the bullet, and he looked into Estrada's bedroom through its open door and did not see "any body" or anything. This statement indicates that before he talked to the detectives, he knew a gun had been fired, and he looked into Estrada's bedroom and did not see a body (or anyone who was hurt). Although Estrada testified he told Peralta he shot Cumplido, Peralta testified Estrada just told him he "fucked up." Clip 1 is inconsistent with Peralta's testimony, and it was relevant evidence because it tended to show Peralta left significant facts out of his testimony. The trial court did not abuse its discretion in allowing the jury to hear it.

16

### b. *Clips 2, 3, and 4*

In Clips 2, 3, and 4, Peralta told the detectives Cumplido was a regular working guy who was never a bad person and was cool with everyone, including Estrada. Peralta said he never saw "anything bad" or an argument, and Estrada never told him he was afraid of Cumplido. Estrada argues the admission of these clips deprived him of a fair trial.

In the three clips, Peralta stated without qualification Cumplido got along with everyone, he never saw anything bad, and Estrada never said he was afraid of Cumplido. Yet on cross-examination defense counsel asked Peralta if Cumplido would get a little aggressive when he drank, and Peralta answered yes. Pressed on redirect by the prosecutor why he did not tell the detectives Cumplido could be aggressive, Peralta said he didn't know why, and he was rarely around when Cumplido drank. Peralta's testimony that Cumplido was aggressive when drinking was inconsistent with his repeated statements to the detectives that Cumplido got along with everyone and he never saw anything bad. Whether Cumplido was aggressive when drinking was relevant to the defense argument that—drunk and high on methamphetamine—he came into Estrada's room and pointed a gun at him, starting the struggle during which Estrada shot Cumplido in self-defense. The trial court did not abuse its discretion when it admitted Clips 2, 3, and 4 as inconsistent with Peralta's testimony.

As a general matter, compliance with the ordinary rules of evidence does not impermissibly infringe on the defendant's right to present his defense. (*People v. Lucas* (1995) 12 Cal.4th 415, 464.) The four interview clips were relevant and admissible,

17

so their admission into evidence does not support Estrada's due process claim.  (*Id.* at p. 450.)

2. ***An involuntary manslaughter instruction was not required***

Estrada argues the trial court had a sua sponte duty to instruct the jury on involuntary manslaughter.  We disagree.

Even in the absence of a request, the trial court has an obligation to instruct on a lesser included offense if substantial evidence would support a jury verdict that the defendant was guilty only of the lesser offense.  (*People v. Romero* (2008) 44 Cal.4th 386, 402.)  Involuntary manslaughter is a lesser included offense of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  A killing is involuntary manslaughter when the defendant kills without malice aforethought and without actually forming the intent to kill.  (*People v. Rogers* (2006) 39 Cal.4th 826, 884.)

No evidence supported a conclusion that Estrada did not form the intent to kill.  Estrada himself testified that he intended to kill Cumplido.  When he managed to take the gun from Cumplido, he "turned it around and shot him" in the head, thinking, "I had to shoot him or he was going to kill me."  Cumplido "put me in that circumstance where I didn't have no choice, it was either my life or his life."  He never stated he intended only to frighten or wound Cumplido, and he shot Cumplido in the head from less than an inch away.

3. ***The prosecutor did not commit misconduct and defense counsel was not ineffective for failing to object***

Estrada contends the prosecutor committed misconduct in closing argument by diluting the burden of proof and by assuming facts not in evidence.  Estrada did not object at trial,

18

and does not argue an objection would have been futile or a judicial admonition would not have cured any error, so he has forfeited a claim of prosecutorial misconduct. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.) Recognizing this, Estrada contends his counsel was ineffective when he did not object. (*People v. Woodruff* (2018) 5 Cal.5th 697, 780.) Estrada has a state and federal constitutional right to the effective assistance of counsel. To show that he did not receive that assistance, he must establish by a preponderance of the evidence that his counsel's representation was objectively unreasonable, and that it is reasonably probable that the outcome of his trial would have been different but for counsel's error. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Because the appellate record rarely demonstrates that a failure to object shows incompetence, "such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

A prosecutor has wide latitude in closing argument, and his remarks amount to misconduct only if the defendant can show a reasonable likelihood the jury understood the comments in an improper manner. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1151.) We address the merits only as necessary to decide Estrada's claim that his counsel was ineffective. (*People v. Ochoa* (1998) 19 Cal.4th 353, 431.)

### a. *Diluting the burden of proof*

The prosecutor reminded the jury that beyond a reasonable doubt, as defined in the instruction, meant an abiding conviction that the charge was true. The evidence did not need to eliminate all possible doubt, but it must convince the jury that "the only

19

reasonable explanation for all the facts that you heard is that he is guilty."

The prosecutor then explained that circumstantial evidence should be considered as a whole, giving the example of a "what is it" game he played with his little boys. "I think of something and I give them clues and we see how fast they can figure out what I'm thinking of. So to explain how circumstantial evidence works with taking everything together," the prosecutor asked the jury to imagine it was playing the game, and he gave it a list of clues describing what he was thinking of. One clue would not be enough for the jury to know the answer. The jury would have to consider all the clues together. "[J]ust like in this case, one thing that you know, one piece of circumstantial evidence alone doesn't prove that he murdered him, but it's when you take them all together, when you look at them all together there's only one answer that fits everything together."

Estrada argues the prosecutor's description of the "what is it" game suggested the jury could reach a conclusion with just a few clues, and trivialized the beyond a reasonable doubt standard. But the prosecutor was describing how the jury should use circumstantial evidence, and told the jury it must consider all the evidence, not just some of it. The prosecutor's description of the standard, and his description of how the jury should use circumstantial evidence, was consistent with the court's instructions.

Estrada also argues the prosecutor told the jury the burden of proof could be satisfied with facts that merely made sense or were more likely to be true. The prosecutor urged the jury to use logic and common sense in evaluating the evidence and the credibility of the witnesses' testimony. Many of the witnesses

were Estrada's family, "and because of that I think you could see that they were hiding the truth from you." The jury should use common sense to sort through their inconsistent statements. "If someone said something earlier and then something different later, what's more likely to be true[?]" He suggested Lopez's testimony that she did not talk about anything with Estrada's family when they drove her to their house to talk to the detectives made no sense; Estrada's trial testimony that he burned the chair cover on the stove only to ignite the carpet (when a kitchen towel was already on the stove) was inconsistent with his preliminary hearing testimony; and Estrada's testimony that he invited Cumplido into his bedroom after Cumplido smoked methamphetamine, and let him handle a loaded gun Estrada left lying out in the dresser, made no sense if, as Estrada also testified, Cumplido became aggressive when he smoked methamphetamine. All this showed Lopez and Estrada were not telling the truth.

These statements did not equate the beyond a reasonable doubt standard with everyday decisionmaking. Instead, they were consistent with the court's instruction that "[i]n deciding whether testimony is true and accurate, use your common sense and experience." (CALCRIM No. 226.) "[T]he prism through which witnesses' credibility should be evaluated is common sense and experience." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1240.) The prosecutor did not tell the jurors "to use their common sense and experience in finding reasonable doubt, which could potentially conflict with the beyond a reasonable doubt standard, but only in assessing a witnesses' credibility." (*Ibid.*)

21

### b. *Arguing facts not in evidence*

Estrada maintains the prosecutor misstated the facts when he argued to the jury the kitchen chairs had been moved into Estrada's bedroom and the red stain on one chair looked like blood, "persuad[ing] the jury to assume that Cumplido was killed in a kitchen chair in appellant's room" and undermining Estrada's self-defense theory. But the prosecutor did not tell the jury it was a fact that the chairs were moved into the bedroom, or that the stain on the chair had been tested and proven to be blood. He argued his theory that the men would not have sat close together on the small couch, and instead they were sitting on the two kitchen chairs when Estrada shot Cumplido in the head during an argument, not in a struggle over the gun. Estrada took off the two chair covers and burned one on the stovetop to destroy blood evidence consistent with the red stain on one of the chair seats. This argument was consistent with the prosecutor's theory that Estrada committed second degree murder. It did not affect the verdict, as the jury rejected this theory when it found Estrada guilty of voluntary manslaughter in imperfect self-defense.

Estrada also assigns misconduct to the prosecutor's argument that the bleach bottle was in Estrada's bedroom because he was trying to clean up, and the bottle was open, tipped on its side, and "it looks like it's empty." Defense counsel argued there was no "stink" of bleach and the only cleaning Estrada was doing was "mental cleansing." Estrada argues there was no testimony that the bottle was empty. But the prosecutor did not say the bottle was empty, only that it looked empty because it was open and tipped on its side. Whether Estrada tried to clean up blood with bleach was unimportant, given

his admission he cut up the bloody carpet and tried to burn it on the stovetop.

None of the prosecutor's statements in closing argument was misconduct, and defense counsel was not ineffective when he failed to object.

## 4. *Substantial evidence supports the verdict*

Estrada argues the only conclusion supported by the evidence is that he killed Cumplido in self defense, describing evidence supporting that conclusion. But in determining whether substantial evidence supports the jury's verdict, we do not ask whether the evidence might have supported a different verdict. Instead, we view the evidence in the light most favorable to the prosecution, without reweighing it or reevaluating witness credibility, and we presume in support of the judgment the existence of every fact the jury could reasonably infer from the evidence. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We ask only whether any reasonable jury could have found the elements of the crime beyond a reasonable doubt, and we do not reverse simply because the evidence would also support a different verdict. (*Ibid.*)

The jury rejected Estrada's theory that he shot Cumplido in self-defense after Cumplido woke him up, pointing a gun at Estrada and saying he was going to kill him. The jury also rejected the prosecution's theory that Estrada committed second degree murder during an argument, shooting Cumplido in the head as he sat in a chair. The jury found Estrada acted in imperfect self-defense and was guilty of voluntary manslaughter.

The jury was instructed that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted in imperfect self-defense, actually believing he was in

23

imminent danger of being killed or suffering great bodily injury and that deadly force was necessary in defense, but at least one of those beliefs was unreasonable. A defendant who kills another under the actual but unreasonable belief that he is in imminent danger of death or great bodily injury does not act with malice, and so is guilty only of manslaughter. (*People v. Booker* (2011) 51 Cal.4th 141, 182.)

The jury could reasonably have concluded from the evidence that during a struggle involving the gun, Estrada actually believed he had to use deadly force against Cumplido, but his belief was unreasonable. Jurors could have viewed the evidence as establishing that Estrada invited Cumplido into his room after both had been drinking and Cumplido had smoked methamphetamine, which sometimes made him aggressive. Estrada nevertheless let Cumplido handle his loaded gun. Whether then or later, a conflict over the gun led Estrada to a sincere but unfounded belief that his life was in imminent danger and he had to shoot Cumplido to protect himself. Estrada testified he had wrested the gun away from Cumplido when he shot Cumplido in the head. The jury could conclude that Estrada was unreasonable in believing he had to use deadly force to defend himself from Cumplido, when Estrada had full possession of the gun and shot Cumplido at close range. While the jury's verdict is not the only reasonable conclusion that could be drawn from the evidence, sufficient evidence supports the jury's finding that Estrada was guilty of voluntary manslaughter.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

LAVIN, Acting P. J.

DHANIDINA, J.

25